GREGORY MONROE,         )
)
      Plaintiff,            )
)
     vs.               )         Case No. 4:06CV1677 CDP
)
LIFE INSURANCE COMPANY   )
OF NORTH AMERICA,       )
)
      Defendant.         )

## MEMORANDUM AND ORDER

Gregory Monroe seeks accidental death and dismemberment benefits from his employee welfare benefit plan following injuries he suffered in a December, 2004 car accident. Monroe asserts that he is entitled to benefits because, as a result of his accident, he is a quadriplegic, having suffered total and permanent loss of use of his upper and lower limbs. Defendant Life Insurance Company of North America ("LINA") has denied Monroe benefits because LINA claims that Monroe is not a quadriplegic or paraplegic as those terms are defined in the plan. Both parties have moved for summary judgment.

The administrative record indicates that Monroe has retained a certain amount of muscle function and movement, although it is unclear whether he has suffered a "total loss of use" of all four of his limbs as required by the terms of his policy. Having reviewed the administrative record and the decision by the plan

administrator carefully, I conclude that the administrator failed to properly define the relevant term "total loss of use" in denying Monroe's claim. The administrator instead relied on evidence that does not support a finding of a total loss of use, and failed to follow the express language of the policy. I will therefore remand Monroe's claim for benefits to the plan administrator for reconsideration.

## **Factual and Procedural Background**

Plaintiff Greg Monroe is a former employee of Cendant Corporation in St. Louis and a participant in an employee benefit plan sponsored by Cendant and insured through defendant Life Insurance Company of North America. On December 3, 2004, Monroe was involved in an automobile accident and suffered a cervical spinal cord injury. Monroe was immediately taken to St. John's Mercy Medical Center, and upon admission he had no sensory or motor function below his shoulders. Monroe underwent a surgical procedure for spinal decompression and received an inferior vena cava filter. After his release from the hospital, Monroe and his family moved to Florida, where Monroe received further treatment and underwent ten months of physical and occupational therapy.

Monroe now seeks accidental death and dismemberment benefits payable under the terms of his employee benefit plan. Under the plan, a claimant is entitled to 100% of available benefits if he is determined to have suffered a covered accident resulting in quadriplegia. A claimant who suffers an accident

resulting in paraplegia is entitled to 75% of available benefits. The plan defines

certain key terms as follows:

> **Quadriplegia** means total Paralysis of both upper and both lower limbs.

> **Paraplegia** means total Paralysis of both lower limbs or both upper limbs.

> **Paralysis or Paralyzed** means total loss of use of a limb. A Physician must determine the loss of use to be complete and irreversible.

> **Physician** [means] a licensed health care provider practicing within the scope of his license and rendering care and treatment to a Covered Person that is appropriate for the condition and locality and who is not:
> 1. employed or retained by the Subscriber;
> 2. living in the Covered Person's household;
> 3. a parent, sibling, spouse or child of the Covered Person.

> <u>Treatment at St. John's Mercy Medical Center</u>. The material facts

surrounding Monroe's injury and treatment are not in dispute. Monroe began

receiving treatment at St. John's immediately following his auto accident on

December 3, 2004. Dr. Bryan Troop, Monroe's attending physician, diagnosed the

plaintiff as having quadriplegia. An MRI of Monroe's cervical spine revealed a

central disk herniation present at C3-4. In addition, he had a spinal cord contusion

approximately 2.9 cm in length. No vertebrae fractures were present. In addition

to diagnosis by Dr. Troop, several physicians at St. John's gave consulting

opinions. Dr. Robert Backer noted that Monroe had no voluntary motor

contraction in his arms or legs. Dr. Rodney Thorley concluded the same, noting that sensation was impaired significantly below C4, and Monroe's shoulders had only minimal movement. Dr. Farrin Manian likewise noted that Monroe couldn't "feel much at all below the upper part of his chest," and could not move his arms or legs. Dr. Manian described Monroe's condition as quadriplegia. Dr. Arthur Auer, another consulting physician, also described Monroe as quadriplegic. Various hospital records from St. John's refer to Monroe's condition as "quadriplegic" and "paraplegic." Dr. Subbuluxmi Natarajan described Monroe as suffering from quadriparesis.[1]

Diagnosis by Dr. Portee. Sometime in early 2005, Monroe was released from St. John's and moved to central Florida, where he came under the care of Dr. David Portee. Monroe was diagnosed with severe hypertonicity and had an intrathecal Baclofen pump implanted in his back. In his communications with other doctors, and in his own notes, Dr. Portee refers to Monroe's condition as "incomplete quadriplegia." In a letter dated August 8, 2006, after having worked with Monroe for close to a year and a half, Dr. Portee described the plaintiff's condition as follows:

> The injury has essentially left him dependent for most activities. He is able to do a few simple things on his own but needs a significant amount of help from his wife for bathing, dressing, transfers and

---

[1]"Quadriparesis," also called "tetraparesis" is muscle weakness affecting all four limbs.

bowel and bladder management.  The amount of effort can be graded as anywhere from maximal to total provided by his caregivers.

Dr. Portee further noted that Monroe was "wheelchair-bound," though he could maneuver his powered wheelchair on his own.  Dr. Portee conceded that Monroe could take a step or two, but that "this was not functional.  It required significant effort on his part as well as assistance of the therapist."  Dr. Portee hypothesized that the movement Monroe had achieved was probably the result of Monroe "selectively controlling to some degree the hypertonicity in his legs."

Dr. Portee further added:

> [Gregory Monroe] will continue to require near maximal to total assistance from his wife and other caregivers on a daily routine basis.  Mr. Monroe may well stand at home but this will only be for exercise and not for function.  Being able to stand for persons with spinal cord injury helps sometimes with pain control, controlling hypertonicity, improving skin integrity as well as optimizing bowel and bladder functioning.

Dr. Portee then concluded:

> [F]or the purpose of classifying the nature and extent of Mr. Monroe's injuries for a disability insurance policy, it is my professional opinion within a reasonable degree of medical certainty that Mr. Monroe suffers from quadriparesis which functionally results in total paralysis of both upper and lower limbs and that this loss of use is complete and irreversible.

Occupational and Physical Therapy Records.  The record contains occupational and physical therapy notes that document Monroe's therapy sessions, beginning in April, 2005 and continuing through early February, 2006.

In occupational therapy, Monroe achieved some measure of progress over the course of these ten months. Monroe was able to perform certain exercises (including a chest press and bicep curls) with weights on various exercise machines. He was able to lift his arms to approximately 70 degrees, which his therapist noted would "translate into him being able to do more tabletop activity such as feeding himself, brushing his teeth, handwriting, computer use, etc." Additionally, Monroe was able to "tolerate sitting at the edge of the mat for 60 minutes." He was also able to perform certain therapy tasks, such as stringing beads and grasping and releasing sponges. At home, Monroe reported that he was able to open the refrigerator door on his own and was "doing better at accessing the TV remote." Monroe was encouraged to "get a long handled sponge with a bend so that he can do his feet and do his back as well as obtain a scrub type brush on a stick so that he can wash his own hair." With assistance, Monroe was able to doff and don his shirt, as well as use a Wanchik writer.

Monroe also made some progress in his physical therapy sessions. Notes document that Monroe was able to perform sit to stand from an elevated surface in a standing frame. He could lean forward from an upright sitting posture without loss of balance. Monroe demonstrated "ability to extend knees and remove foot off foot plate modified independently." With assistance, Monroe could perform sit to stand in parallel bars and pre-gait activities including weight-shifting.

Monroe could also perform supine to sit with moderate assistance for his lower extremities and maximum assistance for his upper extremities.

Initial Denial of Claim by LINA. On June 19, 2006, LINA issued a decision concluding that benefits were not payable to Monroe under the policy. The decision largely consists of a summary of Monroe's progress in physical and occupational therapy. The decision notes that Monroe began working on grasp and release exercises using sponges. Quoting therapy records, the author notes that Monroe "has outstanding potential to regain significant amount of function." According to the decision's author, "there is no indication that Mr. Monroe has reached maximum medical improvement with regard to his upper extremity function." As for his lower extremities, the decision also finds that Monroe "has made remarkable improvement," with therapy focused on tasks such as balance training and "pre-gait activities."

The letter denying Monroe's claim for benefits concludes:

The records regarding his upper extremities confirm that he is able to routinely use his arms to rise to a standing position, perform more focused tasks such as opening the refrigerator, and is able to perform fine manipulation such as stringing beads. The documentation does not support complete and total paralysis of Mr. Monroe's upper limbs.

The records pertaining to Mr. Monroe's lower extremities also show a steady increase in his function. . . . He is able to weight bear and shift weight with verbal cues. The most recent records confirm that he is beginning gait training and has ambulated 4-6 steps with maximum to moderate assist. Once again, there is no indication that Mr. Monroe

has achieved maximum improvement with regard to his lower limb function.

LINA then determined that Monroe's condition did not satisfy the conditions for quadriplegia or paraplegia as those terms are defined in the policy.

<u>Medical Record Review by Dr. Sassoon.</u>  After Monroe appealed the initial denial of his claim, the defendant sought an independent review of Monroe's medical records by Dr. Eddie Sassoon.[2]  Dr. Sassoon provided his opinion in a letter to LINA dated September 21, 2006.  Dr. Sassoon did not examine Greg Monroe, nor did he interview Dr. Portee or Monroe's other treating physicians.  Dr. Sassoon based his opinion solely on the record evidence that was submitted to him, including records from St. John's Mercy Medical Center, records from Dr. Portee, and the physical and occupational therapy notes.

Dr. Sassoon noted the results of Monroe's motor testing.  In his upper extremities, Monroe had 4 out of 5 strength in his deltoids; 5 of 5 in biceps; 3 of 5 in triceps; 1 of 5 and 0 of 5 in left and right wrist extensors, respectively; and 0 of 5 and 2 of 5 in left and right wrist flexors, respectively.  In his lower extremities,

---

[2]In his summary judgment brief, Monroe challenges the notion that Dr. Sassoon's evaluation was "independent."  According to Monroe, Dr. Sassoon has a contract to review files with Intracorp, a wholly owned subsidiary of Cigna Corp., the parent company of the defendant. Plaintiff does not develop this argument further.  Monroe also points out that the credibility of Dr. Sassoon's findings has been called into question by at least one circuit court in the past.  *See Cooper v. Life Insurance Corporation of North America*, 486 F.3d 157 (6th Cir. 2007).

Monroe had 1 out of 5 strength in his hip flexors; 5 of 5 in quads, and 1 of 5 in dorsiflexors.

Dr. Sassoon also noted the progress in Monroe's physical therapy sessions. Dr. Sassoon wrote:

> The patient performed sit to supine with moderate assist. Transfers from wheelchair to mat using a boost transfer required mild assist. Stand pivot transfers required mild to max assist. Scooting on the right side on level surfaces. Sit to stand required minimal assist from wheelchair, mod to max assist on low surface. The patient performed weight shifts and parallel bars and min assist for upright posture. He ambulated 4 to 6 steps with max assist and mod assist to advance his lower extremities in the parallel bars.

As part of the review process, defendant Life Insurance Company of North America asked Dr. Sassoon to provide his professional medical opinion in response to the specific question "whether Mr. Monroe has suffered complete irreversible loss of use of both upper and lower extremities." Dr. Sassoon responded in part:

> Patient [is] progressing well with bed mobility, transfers and gait activities using KAFO an parallel bars although he did require mod assist to max assist with most transfers per documentation from physical therapy February 6, 2006. These findings suggest that the claimant did not suffer complete irreversible loss of the upper and lower extremities. There still is residual function noted with the claimant able to perform transfers with mod assist, change position from sit to stand with min assist and ambulate for a few steps in the parallel bars with mod assist to max assist. This suggests that there is not complete irreversible loss of use of the upper and lower extremities.

Final Denial of Claim by LINA.  The defendant issued its final denial of Monroe's claim for benefits on October 4, 2006.  The letter issued by the defendant contains a short summary of a few facts from Monroe's therapy records.  The letter describes Monroe's progress with weight exercises and cites therapy records showing "Mr. Monroe is able to lift his arms approximately to 70 degrees. . . . [T]his movement will allow Mr. Monroe to be able to do more tabletop activity. . . . Additionally, the medical records state that with a long handled sponge with a bend and a scrub type brush on a stick Mr. Monroe was able to wash his own feet, back and hair."

The letter quotes the medical opinion of Dr. Sassoon.  The decision then concludes:

> While the medical records do support the fact that Mr. Monroe does suffer from limited functional capacity, this loss is not considered a dismemberment or paralysis as defined by this policy.  This policy provides benefits for the complete severance through or above the wrist or ankle joint.  Additionally, paralysis means a complete and not reversible loss of use.  Having reviewed the available records, there is no documentation to support the fact that Mr. Monroe suffered the complete severance of each through or above the joint closest to the wrist or ankle nor have losses resulted in paraplegia or quadriplegia as defined by this policy.

The medical opinions of Monroe's treating physician, Dr. Portee, are not discussed.  Similarly, there is no discussion of any medical examination of Monroe.  The letter Dr. Portee wrote to LINA describing Monroe's condition and prospects for improvement is not mentioned.

Deposition of Dr. Sassoon. Following the instigation of this lawsuit, plaintiff's counsel deposed Dr. Sassoon and inquired into the methods and reasoning behind his review of Monroe's medical records. In his deposition, Dr. Sassoon talked about Monroe's physical therapy records and their application to "the real world." Dr. Sassoon noted that "a better example [of something a patient might be able to do in the real world] would be like the buttoning or unbuttoning of a shirt button . . . how quickly can the patient do it, does he need assistance." Dr. Sassoon admitted that in his review of the therapy records, there was no indication that Monroe was able to complete his therapy activities at home without assistance.

Dr. Sassoon also testified regarding physical therapy for quadriplegic patients. While a quadriplegic might engage in some form of physical therapy, Dr. Sassoon noted that the goal of such therapy was really to prevent loss of muscle mass and further complications. Dr. Sassoon was also asked to describe what he meant when he said that Monroe had not suffered a "complete irreversible loss of use" in his upper and lower extremities:

> Q: But in terms of answering the question that was posed to you, you believe that Mr. Monroe does have use of his upper and lower extremities?
>
> A: Well, you know, I guess the way, when I did the report, you know, use I equated with, you know, residual muscle function. That's how I performed the report. I didn't go into specifics

like Dr. Portee did about, you know, more other questions as he did.

Dr. Sassoon further testified:

> Q: Was there anything in your report that reflects your review of the medical records where Greg Monroe was able to do, to use his upper or lower extremities without assistance?
>
> A: No.

Dr. Sassoon then reiterated that his assessment of Monroe's ability to "use" his limbs was focused on motor function:

> Q: And based upon the questions that Mr. Davis has asked you today and the other information he has provided to you, does it continue to be your opinion within a reasonable degree of medial certainty that there was not a complete and irreversible loss of use of the upper and lower extremities?
>
> A: Yes, in the sense that we qualify that as, you know, motor return.

Dr. Sassoon's deposition testimony was taken only after this lawsuit was filed, and was never part of the administrative record. Officials at LINA who reviewed Monroe's claim for benefits thus did not have Sassoon's deposition testimony available to them. Defendants have filed a motion to strike Dr. Sassoon's testimony, asserting that under an arbitrary and capricious standard of review, the deposition transcript may not be considered.

## Legal Standards

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the court views the facts and inferences

from the facts in the light most favorable to the nomoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The first step in evaluating a claim under ERISA is determining the appropriate standard of review. When evaluating a challenge to a denial of benefits, the court conducts de novo review unless the plan grants its administrator discretionary authority to determine benefit eligibility or construe the terms of the plan. *Janssen v. Minneapolis Auto Dealers Ben. Fund*, 477 F.3d 1109, 1113 (8th Cir. 2006) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If a plan gives discretion to a plan administrator, the plan administrator's decision is reviewed under a deferential abuse of discretion standard. *Id.* Review under this standard, though deferential, is not tantamount to rubber-stamping the result. The plan administrator's decision is reviewed for reasonableness, which requires that it be supported by substantial evidence that is assessed by its quantity and quality. *Torres v. Unum Life Insurance Company of America*, 405 F.3d 670, 680 (8th Cir. 2005). Generally, if an administrator's decision is "extraordinarily imprudent or extremely unreasonable, the court is likely to find that there has been an abuse of discretion." *Cox v. Mid-America Dairymen, Inc.*, 965 F.2d 569, 572 (8th Cir. 1992) (citing George G. Bogert & George T. Bogert, The Law of Trusts and Trustees § 560, at 201-04 (rev. 2d ed. 1980)).

Here, the Plan gives LINA discretion to interpret its terms:

[T]he Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law.

Nevertheless, in certain cases a beneficiary may establish facts mandating a less deferential standard, even where the plan grants discretion to the administrator. *Buttram v. Central States, S.E. & S.W. Areas Health & Welfare Fund*, 76 F.3d 896, 899 (8th Cir. 1996). A less deferential standard will apply where the claimant can show that (1) a serious procedural irregularity in the plan administrator's decision making existed, which (2) caused a serious breach of the plan trustee's fiduciary duty to the plan beneficiary. *Id.* at 900. A mere procedural irregularity standing alone however, is not sufficient. The irregularity must have some connection to the substantive decision reached; i.e., the irregularity must cause the actual decision to be a breach of the plan trustee's fiduciary obligations. *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1031 (8th Cir. 2001); *Buttram*, 76 F.3d at 901.

A "serious procedural irregularity" in this context refers to the sorts of external factors sufficient under the common law of trusts to call for a less deferential standard of review. *Pralutsky v. Metropolitan Life Insurance Company*, 435 F.3d 833, 838 (8th Cir. 2006). Where a plan trustee labors under a conflict of interest, or acts dishonestly, or from an improper motive, or fails to use

judgment, the resulting decision may be accorded stricter scrutiny. *Buttram*, 76

F.3d at 900 (citations omitted). *See also Woo v. Deluxe Corp.*, 144 F.3d 1157,

1162 (8th Cir. 1998) (plan administrator's "failure to use proper judgment," when

combined with a financial conflict, found to be egregious conduct warranting less

deference). When a claimant asserts that an administrator failed to use proper

judgment, less deference will be afforded where the claimant offers "evidence that

gives rise to serious doubts as to whether the result reached was the product of an

arbitrary decision or the plan administrator's whim." *Weidner v. Federal Express*

*Corporation*, 492 F.3d 925, 928 (8th Cir. 2007); *Hillery v. Metropolitan Life*

*Insurance Company*, 453 F.3d 1087, 1090 (8th Cir. 2006). In order to meet this

burden, a claimant must show that the irregularity is "so egregious that it might

create a total lack of faith in the integrity of the decision making process."

*Hillery*, 453 F.3d at 1090.

## Discussion

With these principles in mind, I turn now to the facts of this case, and look

first to the procedures used by LINA in denying Greg Monroe accidental death

and dismemberment benefits.

### Procedural Irregularities

Monroe first argues that LINA's decision suffers from a procedural

irregularity because LINA did not base its decision to deny benefits on the opinion

of a "physician" as that term is defined in the policy. Monroe cites the plan's definitions of "Quadriplegia" and "Paralysis," which are as follows:

**Quadriplegia** means total Paralysis of both upper and both lower limbs.

**Paralysis or Paralyzed** means total loss of use of a limb. A Physician must determine the loss of use to be complete and irreversible.

Taken together, the two definitions specify that in order to be quadriplegic (and thus eligible for full benefits), a "physician" must determine the loss of use to be complete and irreversible. A "physician" is defined elsewhere in the policy as a licensed health care provider "rendering care and treatment." Thus, Monroe argues that because Dr. Sassoon merely reviewed medical records and did not render any treatment, it was improper for LINA to rely on Dr. Sassoon's medical opinion that Monroe was not quadriplegic. According to Monroe, the only "physician" within the meaning of the policy whose opinion matters is that of Dr. Portee – and Dr. Portee diagnosed Monroe as quadriplegic.

This argument misconstrues the language of the policy. Admittedly, Dr. Sassoon is not a "physician" under the terms of the plan. But the plan does not mandate that a "physician" make the determination that a claimant is *not* eligible. The plan merely says that if a claimant is to be given benefits because he is quadriplegic, a treating physician must have made the necessary determination.

The fact that Monroe's treating physician, Dr. Portee, diagnosed Monroe as suffering from complete and irreversible use of his limbs is not controlling. Dr. Portee's or another physician's diagnosis of quadriplegia is necessary for Monroe to be eligible for benefits, but it is not sufficient. LINA did not disregard the language of its own policy by relying on the medical assessment by Dr. Sassoon. Even assuming *arguendo* that Monroe's interpretation of the plan is a reasonable one, LINA cannot be faulted for applying its own reasonable interpretation. *Riddell v. Unum Life Ins. Co. of America*, 457 F.3d 861, 865 (8th Cir. 2006). Thus, LINA committed no procedural irregularity in relying on the medical opinion of a "non-physician."

Monroe next argues that LINA committed procedural error in basing its decision on Monroe's occupational and physical therapy records, the medical opinion of Dr. Sassoon, and the results of Monroe's strength testing. LINA concluded that Monroe's condition did not meet the plan's definition of quadriplegia or paraplegia because Monroe did not suffer a "total loss of use" of his limbs that was "complete and irreversible." LINA's decision cites evidence from Monroe's therapy sessions that Monroe was "progressing on a daily basis" and making "remarkable improvement." The evidence submitted showed that Monroe was able to perform "grasp and release exercises" with sponges and could perform tasks such as stringing beads. In addition, Monroe was able to perform

various physical therapy exercises, could "open the refrigerator door on his own," and was "doing better at accessing the TV remote."

LINA's decision regarding Monroe's lower extremities also relies heavily on therapy notes indicating that Monroe could perform exercises. Evidence showed that he was able to move his foot off his wheelchair foot plate, could "weight shift toward the toes," and could perform various types of sit-to-stand transfers with varying levels of assistance. In the parallel bars, Monroe was able to "ambulate four to six steps with moderate to maximum assistance to advance his lower extremities."

Relying on these facts, LINA concluded that Monroe had regained "a significant amount of function" in his upper and lower extremities, and was therefore not quadriplegic. LINA did not discuss the medical opinion of Monroe's primary treating physician, Dr. Portee, nor did it discuss any of the records submitted by the other physicians who examined Monroe. Monroe contends that this alleged failure to take a balanced look at the evidence was a procedural irregularity. LINA selectively chose to examine evidence that supported a denial of Monroe's claim, while ignoring other evidence to the contrary.

As a general rule, where medical opinions conflict, a plan administrator does not commit a procedural error by choosing to favor one opinion over the other. *Rutledge v. Liberty Life Assurance Co. of Boston*, 481 F.3d 655, 660 (8th

Cir. 2007); *Hunt v. Metropolitan Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2006). Plan

administrators have broad discretion to interpret a plan's terms and to assess the

weight and credibility of evidence. An administrator generally has no obligation

to obtain an independent medical examination of the claimant. *Rutledge*, 481 F.3d

at 661; *Torres v. Unum Life Ins. Co. of North America*, 405 F.3d 670, 678 (8th Cir.

2005). Nor is an administrator required to give special weight to the medical

opinion of a claimant's treating physicians. *Hunt*, 425 F.3d at 491. A plan

administrator is not required to discuss and analyze every piece of relevant

medical information when issuing a decision on a claim. *See Hillery v.

Metropolitan Life Ins. Co.*, 453 F.3d 1087, 1090 (8th Cir. 2006). Objections to the

manner in which evidence was weighed and the conclusions reached are

substantive disagreements with a plan administrator's analysis, and do not reflect

procedural irregularities. *Weidner v. Federal Express Corp.*, 492 F.3d 925, 928

(8th Cir. 2007).

Nevertheless, in the circumstances of this particular case, I am convinced

that Monroe has made an adequate showing that LINA committed a procedural

irregularity by failing to use proper judgment in reviewing Monroe's claim. LINA

failed to give even a passing explanation for its refusal to credit the medical

opinion of Dr. Portee. The plan administrator discussed Monroe's physical and

occupational therapy records at length, but made no mention of any evidence that

supported his claim for quadriplegia. *See Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 379 (3d Cir. 2000) (noting that one factor counseling less deference toward an administrator's decision is whether the insurer relied upon evidence consistent with its decision to deny coverage while not crediting or explaining evidence that would support coverage).

More importantly, LINA failed to demonstrate how its decision was supported by the language of the plan. The plan at issue in this case defines quadriplegia as "total paralysis of both upper and lower limbs." "Paralysis" is then defined as a "total loss of use" of the limb. The loss of use must be "complete and irreversible." The decision denying coverage asserts that Monroe is not quadriplegic because he retained "a significant amount of function." Nowhere does the decision explain how this "function" can be equated with "use." LINA pointed to evidence that Monroe could do such things as "weight shift" and move his foot off his wheelchair foot plate. However it is not readily apparent how these motor functions can be called "use." The plan provides no definition of the word "use," and LINA seemingly did not apply any standard for what would amount to use, other than to say that Monroe met that standard.

LINA described various exercises Monroe could complete, and certain therapy goals that he met, but did not say how Monroe was able to "use" his limbs as that term would normally be understood. Weight shifting does not amount to

use.  "Ambulating" in the parallel bars with "moderate to maximum assistance to advance his lower extremities" cannot reasonably be interpreted as "use."  On the contrary, this therapy note indicates that  Monroe's physical therapists had to physically move his feet for him.  This is akin to "referring to shackles as an effective means of locomotion."  *Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting).

With respect to Monroe's upper extremities, LINA cited tasks such as stringing beads and squeezing sponges that Monroe was able to complete.  Though LINA did not discuss the purpose behind these activities, it is perhaps arguable that these demonstrations of motor function could qualify as use.  However it is impossible say for sure if this is what LINA meant, since LINA never set forth a standard for "use."  Additionally, LINA's analysis of his upper extremities is further suspect because of a glaring misintepretation of the records: LINA said that Monroe "was able" to wash his own feet, back and hair by using a long handled sponge, but the records do not say that at all.  The records say that the therapist encouraged him to try that technique, not that he "was able" to do it.

LINA did not apply a discernable standard to the term "use."  LINA merely concluded that Monroe could perform certain activities or exercises, concluded that these activities demonstrated "function," and concluded that therefore Monroe was not a quadriplegic.  This type of reasoning raises serious concerns that

LINA's ruling was the product of an arbitrary decision, rather than an assessment grounded in the terms of the plan.  Taken together with LINA's one-sided look at the evidence, and the absence of any discussion relating to Monroe's treating physicians, LINA's failure to use proper judgment results in a total lack of faith in the integrity of the decision making process used in this case.  For these reasons, I conclude that LINA's decision to deny Monroe benefits was the product of a procedural irregularity, and should not be afforded deference under the arbitrary and capricious standard.

### Dr. Sassoon's Deposition

Before reviewing the merits of the plan administrator's decision, I will turn first to the deposition of Dr. Sasson filed by plaintiff.  LINA has moved to strike the deposition transcript because it was not part of the evidence considered by LINA in making its decision.[3]

Ordinarily, additional evidence gathering in ERISA cases beyond what is contained in the administrative record is ruled out on deferential review, and is discouraged on de novo review to ensure expeditious judicial review of ERISA benefit decisions and to keep district courts from becoming substitute plan administrators.  *Brown v. Seitz Foods, Inc. Disability Benefit Plan*, 140 F.3d 1198,

---

[3]LINA's motion also seeks to strike responses to plaintiff's interrogatories, as well as information taken from websites referenced in the plaintiff's briefs.  I need not address these items separately, because my ruling on the deposition issue also applies to them.

1200 (8th Cir. 1998) (citations omitted).  However, a district court may consider additional evidence if the plaintiff shows good cause.  *Rittenhouse v. UnitedHealth Group Long Term Disability Insurance Plan*, 476 F.3d 626, 630 (8th Cir. 2007); *Brown*, 140 F.3d at 1200.  Where the evidence submitted goes toward determining the appropriate standard of review, the general prohibition on evidence outside the administrative record does not apply.  *Farley v. Arkansas Blue Cross and Blue Shield*, 147 F.3d 774, 776 n.4 (8th Cir. 1998).

Dr. Sassoon testified that his review of Monroe's medical records was focused on "residual muscle function."  He noted that there was no evidence in the record that would indicate that Monroe was able to complete physical therapy tasks without assistance.  Dr. Sassoon qualified his opinion that Monroe was able to "use" his upper and lower limbs by saying that he (Sassoon) was speaking only in terms of "motor return."

This evidence makes clear that Dr. Sassoon equated "use" of limbs with motor function (i.e., movement).  By adopting the opinion of Dr. Sassoon in its decision to deny benefits, LINA abandoned the plan language of the policy.  "Use" and "movement" are very different concepts, but Dr. Sassoon failed to draw a distinction between the two.  I may properly consider Dr. Sassoon's deposition because it provides further evidence that LINA's decision should not be given the usual deference.  LINA failed to define "use" of a limb, and instead relied on the

opinion of Dr. Sassoon, whose opinion was at odds with the plain language of the policy. I do not consider the deposition transcript to be direct evidence supporting Monroe's claim for benefits; rather, it is evidence that tends to show that LINA acted unreasonably in interpreting the language of the policy. For these reasons, I will consider Dr. Sassoon's deposition transcript in ruling on summary judgment, and I will deny LINA's motion to strike.

Review of LINA's Decision

There is very little guidance in the case law for a case of this type. Disputes over accidental death and dismemberment benefits are not common in ERISA litigation. The issue here is not the much more common question of whether a claimant is "disabled" or has suffered a "total disability," but rather whether Monroe's current medical condition fits within the definition of quadriplegia or paraplegia as those terms are defined in the benefit plan. Neither of the parties has cited any factually similar case law, and I have not found any analogous precedent. My decision is guided by the plain language of the benefit plan in this case and the general principles that underlie an administrator's fiduciary duty to properly apply the plan's terms.

When LINA denied Monroe benefits, it made a finding that Monroe had not suffered a "total loss of use" of his limbs. "Use" is not defined in the policy. Therefore an ordinary definition (and an insured's expectations of what would be

covered under the plan) governs. *See Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 753 (8th Cir. 2006) (A plan administrator cannot redefine words in ways that would undermine a claimant's justified expectations as to what the words meant.). The American Heritage Dictionary of the English Language, 4th ed. defines the verb "to use" as "To put into service or apply for a purpose; employ." As a noun, "use" is defined as "The act of using, the application or employment of something for a purpose." Inherent in these definitions is the notion that there must be a purpose, or something to be accomplished through the activity performed.

At oral argument, counsel for the defendant conceded that mere movement would not amount to use. Yet, the record in this case reflects that LINA concluded that Monroe could "use" his limbs merely because he could move them. The plan administrator cited evidence that Monroe could move his foot off his wheelchair footplate, was able to "weight shift" in the parallel bars, and could raise his arms to 70 degrees. These facts demonstrate that Monroe had motor function, as Dr. Sassoon indicated. But they do not show use.

Similarly, evidence relating to Monroe's strength tests or his ability to perform exercises does not support a finding of use. Granted, if one is "using" one's limbs to do exercises or to demonstrate strength, this can in some sense be called "use." But in the context of physical therapy, this reasoning is circular and

leads to absurd results.  It cannot be said that Monroe is using his limbs if the only purpose for which he can use them is therapy – the very goal of which is to re-gain use and promote muscle development.  Use done in order to achieve use is not itself use.  More importantly, use done in order to condition muscles (and with no ultimate goal or purpose in mind, other than the related health benefits) can result in improved muscle strength, but it cannot be seen as "use" or "employment" for a purpose.  As both Dr. Portee and Dr. Sassoon have stated, in Monroe's case, physical therapy helped to prevent loss of muscle mass.  But Monroe's progress in therapy does not support a conclusion that he regained "use" his limbs.

To conclude as LINA did that Monroe has use of his limbs begs the question – what is the minimum amount of function that would constitute use?  If any amount of progress in physical therapy can suffice as evidence of use, it seems clear that almost no one would qualify for benefits under this policy.  In fact, the only claimants eligible for benefits would be ones who engage in no physical therapy at all, and who are utterly incapable of movement or motor return.  Even in this case, it is possible to imagine claimants who might be able to move a single finger, and who could thereby "use" their limbs to operate a motorized wheelchair. "Total loss of use" as that phrase is used in this policy must be given a reasonable

meaning.[4]  It cannot be interpreted so as to deny coverage to all but those who are catatonic.

LINA advances a number of arguments for why the plan administrator's decision to deny coverage should be upheld.  First, LINA argues that Monroe was diagnosed by his treating physician and others who examined him as suffering from "incomplete quadriplegia."  According to LINA, the fact that Monroe's quadriplegia is "incomplete" necessarily means that he did not suffer a "total" loss of use.  This argument fails because it is not supported by the language of the policy.  Counsel for Monroe has pointed out that the phrases "incomplete quadriplegia" and "complete quadriplegia" are technical terms defined in the International Standards for Neurological Classification of Spinal Cord Injury.  The difference between complete and incomplete quadriplegia depends on whether a patient has sensory or motor function preserved in the sacral segments S4-S5.  A "complete quadriplegic" is someone who has no ability to contract the external anal sphincter.  Thus, the terms "complete" and "incomplete" quadriplegia are not synonymous with "total" and "partial" loss of use of one's limbs.  *Cf. Reed-*

---

[4]Several ERISA cases in the context of disability insurance have reached similar conclusions interpreting the phrase "totally disabled."  *See, e.g., Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998) ("We, of course, agree that such 'general' disability provisions should not be construed so literally that an individual must be utterly helpless to be considered disabled."); *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d, 458 (9th Cir. 1996) ("There is little question that the phrase should not be given [a literal] construction, as 'total disability' would only exist if the person were essentially non-conscious.").

*Richards v. Clemson University*, 638 S.E.2d 77 (S.C. Ct. App. 2006) (holding in a worker's compensation case that a diagnosis of "incomplete paraplegia" was sufficient to qualify claimant for benefits as a "paraplegic"). Even aside from the definition of these medical terms, however, LINA's argument fails because it is not supported by the policy language. The policy awards benefits if a claimant has suffered a "total loss of use," not if he or she is a "complete quadriplegic." The relevant inquiry remains whether the claimant can use his limbs. Diagnoses containing terms like "complete" and "incomplete" are not relevant.

LINA next argues that Monroe was properly denied benefits because his treating physician Dr. Portee described his condition as "quadriparesis," meaning Monroe suffered from muscle weakness in all four limbs. Moreover, in writing a letter to LINA, Dr. Portee stated, "for purposes of classifying the nature and extent of Mr. Monroe's injuries for a disability insurance policy," that Monroe suffered a "total paralysis of both upper and lower limbs [that is] complete and irreversible." LINA argues that Dr. Portee's medical opinion is thus relevant only in the context of disability insurance, and should be discounted in this case, where accidental death and dismemberment benefits are at issue. This argument again fails because it is not grounded in the terms of the plan. Neither Dr. Portee's use of the term "quadriparesis" nor his passing reference to disability insurance has anything to do

with whether Monroe can use his limbs.  It is the plan's definition of the relevant terms that controls.

Finally, LINA argues that Monroe was properly denied benefits because his condition is not "complete and irreversible" as required by the policy.  LINA points to physical and occupational therapy reports that note Monroe's "remarkable improvement," "outstanding potential," and that he was "progressing on a daily basis."  Because Monroe made progress in therapy, LINA argues that his loss cannot be "complete."  This argument fails to take into account the purpose of physical and occupational therapy.  While the language of the policy does require that the loss of use meet a certain standard (i.e., that it be "total" and "complete and irreversible"), it is unreasonable for LINA to conclude that any "progress" made in therapy automatically makes Monroe ineligible for benefits.  Progress in terms of muscle mass, strength, and ability to do exercises can result in significant health benefits, yet still not amount to use.  It is the "use" that must be completely and irreversibly lost.  A claimant need not be beyond all hope for any improvement before receiving benefits.  Such a rule would discourage any claimant from ever seeking therapy for injuries such as those suffered by Monroe.  As the records in this case show, Monroe was able to make "progress" in that he could develop sensory and motor function.  But as discussed previously, these facts do not by themselves support a finding that Monroe had use of his limbs.

The administrator's decision is not supported by the evidence, and the administrator applied an incorrect definition of "use" to determine whether Monroe had total loss of use of his limbs. Some of the evidence may in fact support a conclusion that he has use of his limbs, especially his arms. Therapy notes show that Monroe was able to perform activities such as stringing beads, grasping sponges, and opening a refrigerator. Notes also make reference to certain daily living activities that Monroe "will be able" to do, or is "progressing toward," although the record does not contain findings by any physician in this regard.

It is at least conceivable that these therapy exercises could translate into "use" in the broader sense. However, I am reluctant to conclude that they can or cannot be considered "use" based on the record before me. Many of the tasks Monroe can purportedly perform are done "with assistance," and in several instances therapists noted that Monroe needed "moderate to maximum assistance" to complete tasks or perform transfers. I cannot say, on this record, whether these activities done "with assistance" involve any "use" of Monroe's limbs on his own behalf. Some of the evidence cited by the plan administrator might, in certain circumstances, support a finding of use. However, that conclusion is undermined in this case by the substantial amount of evidence that the administrator cites which does not support a finding of use. The administrator's decision does not apply a consistent, plain-language definition for the term "use." Rather, the

decision recites evidence of movement, progress relating to muscle function, and activities that can be done with assistance. For these reasons, the plan administrator's decision in this case cannot be upheld.

Remand to Plan Administrator

Because LINA did not apply a proper definition of "use" to evaluate the case, it is appropriate for me to remand this case to the administrator for consideration in light of the ordinary definition – which includes the concept of using the limbs to perform everyday functions. Where a plan administrator applies an improper definition to a key term, remand may be an appropriate remedy. *See King v. Hartford Life & Ac. Ins. Co.*, 414 F.3d 994, 1005 (8th Cir. 2005); *Abram v. Cargill, Inc.*, 395 F.3d 882, 887 (8th Cir. 2005). Here, LINA failed to apply a definition of any kind for the key term "use," and instead recited evidence of what Monroe could "do." LINA must reconsider Monroe's claim – both as to quadriplegia and paraplegia – applying a proper standard for "use" based on the plain language meaning of that term. I conclude therefore that the proper remedy in this case is to remand Monroe's claim for benefits to LINA for reconsideration.

Eighth Circuit case law holds that an order remanding an ERISA case to a plan administrator for further consideration is not a final judgment disposing of the case. *See Borntrager v. Central States, Southeast and Southwest Areas Pension Fund*, 425 F.3d 1087 (8th Cir. 2005). This rule is consistent with a

number of other circuit courts that have considered the issue. *See Petralia v. AT&T Global Information Solutions Co.*, 114 F.3d 352 (1st Cir. 1997); *Shannon v. Jack Eckerd Corp.*, 55 F.3d 561 (11th Cir. 1995); *see also Graham v. Hartford Life and Accident Ins.* Co., 501 F.3d 1153 (10th Cir. 2007)(explaining Tenth Circuit case-by-case approach); *but see Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975 (7th Cir. 1999) (holding that a remand to an ERISA administrator is a final appealable decision). Therefore, this court will retain jurisdiction over the cause of action.

On remand, the plan administrator should apply the proper, plain language definition of the term "use" in assessing whether Monroe has suffered a "total loss of use" of his upper and lower limbs. The administrator should further develop the administrative record, including considering any additional evidence submitted by Monroe on the issue of use. The parties will then be required to report back to the court and inform the court what further action, if any, is needed in this case. If appropriate, the court will then hold an additional scheduling conference. This case will remain open and active on the court's docket.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's claim for benefits is remanded to the plan administrator for reconsideration. No later than **February 15, 2008** plaintiff will file with the plan administrator any additional evidence he believes

should be considered.  No later than **April 15, 2008** LINA shall obtain any additional evidence it believes appropriate and shall make a final decision on plaintiff's claim.  There shall be no administrative appeal of this decision.  Within ten days of LINA's decision, the parties shall inform the court of the decision and whether further action is required in this case.

**IT IS FURTHER ORDERED** that defendant's motion [#38] to strike submissions outside the administrative record is DENIED.

**IT IS FURTHER ORDERED** that defendant's motion [#34] for summary judgment is DENIED.

**IT IS FURTHER ORDERED** that plaintiff's motion [#32] for summary judgment is DENIED.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 20th day of December, 2007.